**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NEELAM VASHI, MD,          ) <br>     Plaintiff,         ) <br>                   ) <br> v.                 ) <br>                   ) <br> BOSTON UNIVERSITY   ) <br> DERMOTOLOGY, INC.,    ) <br> BOSTON UNIVERSITY   ) <br> SCHOOL OF MEDICINE, and  ) <br> BOSTON MEDICAL CENTER  ) <br>     Defendant.        ) <br>                   ) | Civil Action No. |

**COMPLAINT AND JURY DEMAND**

**<u>INTRODUCTION</u>**

The Plaintiff, Neelam Vashi, M.D. ("Dr. Vashi"), who worked as for the Defendant, Boston University Dermatology, Inc. ("BUD"), Boston University School of Medicine ("BUSM"), and the Boston Medical Center ("BMC") from 2012 until her unlawful termination on November 18, 2024.  Dr. Vashi founded a center that focused on cosmetics for the skin of people of color.  She is a prolific writer, researcher, and mentor.  Her research has led to hundreds of media appearances, all of which brought attention and acclaim to the Defendants.  She also handled a busy practice, seeing approximately 50 patients a day, as required by the Defendants. She was one of the most productive doctors with one of the most lucrative practices at BUD.

She is the mother of three children, all of whom she had while employed with BUD, BUSM, and BMC.  She took her federal entitlement under the Family and Medical Leave Act ("FMLA") for each of the births and used the Defendants' paid leave.   Each time she took FMLA leave the chair of the department, Rhoda Alani ("Dr. Alani"), Dr. Christina Lam, the medical director and Vice Chair ("Dr. Lam"), and Dr. Lisa Shen, the residency program director

1

("Dr. Shen") retaliated against her.  The pattern of retaliation got so bad, that by her third child, Dr. Vashi took only a partial full-time leave and took the rest intermittently.  The retaliation escalated with each FMLA leave Dr. Vashi took and reached a fever pitch after her third leave ended in June, 2023.  At the end of 2024, Dr. Lam grabbed a variety of pretexts to fire Dr. Vashi and barred her from working at a low-income patient clinic, even as a non-employee.

Between 2023 and 2024 when she was fired, Dr. Lam, Dr. Shen, and Dr. Alani recruited residents to make false allegations about Dr. Vashi, blamed her for longstanding problems of the residency program, stole patients from her lucrative cosmetic practice and gifted them to childless doctors who were not qualified to take on the patients, and deprived Dr. Vashi of resources to manage the heavy patient load.  The retaliation reached a breaking point in early 2024 with the public circulation of a petition filled with false claims about Dr. Vashi, seeking her ouster.  It was written by Dr. Alani's mentee, a resident named Dr. Frederick Gibson. Dr. Shen promoted and encouraged residents to sign Dr. Gibson's petition seeking Dr. Vashi's removal.

After an investigation in early 2024 illustrated how false the petition was and how well-regarded Dr. Vashi was, Dr. Alani was removed as chair.  Dr. Alani did not leave the organization—she remained in an office down the hall with a $30,000 per year stipend. Changing the chair did nothing to stop the retaliation because Dr. Lam, who had also retaliated against Dr. Vashi, replaced her as Interim Chair.  Dr. Shen, Dr. Lam, and the residents faced no consequences at all for their roles in the retaliation. Dr. Vashi expressed reservations about elevating Dr. Lam to be Interim Chair and that the failure of any consequences to others would perpetuate the retaliation.  The Defendants took no heed.  Instead, the Chief Medical Officer warned Dr. Vashi to "obey" Dr. Lam and not to be "insubordinate."

Unsurprisingly, Dr. Lam continued where Dr. Alani left off.  She continued to deprive Dr. Vashi of resources, to move her patients to other doctors, encouraged a resident to falsely report that Dr. Vashi signed out controlled substances under a resident's name, falsely accused Dr. Vashi of creating "chaos" in the clinic and of insubordination.  Dr. Vashi went to both human resources and the Omnibuds, but the Defendants still took no action.  The retaliation got so bad, Dr. Vashi took intermittent FMLA leave because she developed problems with her mental health.  She deliberately did not take full time FMLA leave because of the years of previous FMLA retaliation.

Dr. Lam fired Dr. Vashi at the end of 2024, falsely accusing her of causing "chaos" in the organization and of insubordination.  Dr. Vashi was still taking intermittent FMLA leave.  When Dr. Vashi protested being fired while taking FMLA leave, the human resources representative, Robin Lucier, who had urged Dr. Vashi to take FMLA leave despite her misgivings, told her that being on FMLA leave "does not matter".

Dr. Vashi contends that the Defendants ended her employment, and her successful career at BUD, in retaliation for taking leaves under the FMLA and brings this action for unlawful retaliation for having exercised his rights under the FMLA and for interference with her ability to take FMLA leave to treat her mental health.  She seeks lost wages and benefits, emotional distress damages, punitive damages, attorneys' fees, and costs, all as provided for by law.

## PARTIES

1. The Plaintiff, Dr. Vashi, is an individual residing in Newton, Middlesex County, Massachusetts. Dr. Vashi saw patients and performed procedures at facilities owned by Boston Medical Center, Boston University Dermatology, Inc., Boston University School of Medicine, or in other facilities owned, controlled, and operated by the Defendants.  At

3

all relevant times to this complaint, Dr. Vashi was jointly employed by BUD, BUSM, and BMC, making her an employee as defined by the FMLA.

2. The Defendant, Boston University Dermatology, Inc., ("BUD") is a Massachusetts nonprofit corporation and faculty practice for the Department of Dermatology of Boston University School of Medicine ("BUSM"). BUD is organized and operated for the benefit of Boston Medical Center Corporation ("BMC") and Boston University School of Medicine ("BUSM").  BUD operates at 609 Albany Street, Boston, Suffolk County, Massachusetts.  Dr. Vashi saw patients and performed procedures there or in other facilities owned, controlled, and operated by BUD.  BUD is an employer as defined by the FMLA and at all relevant times to this complaint controlled the terms and conditions of Dr. Vashi's employment.

3. The Defendant, the Boston University School of Medicine ("BUSM"), is a medical school located at 72 East Concord Street, Boston, Suffolk County, Massachusetts. BUSM controls BUD, which is operated for its benefit, and controls where BUD's doctors can practice and the conditions under which they practice.  BUSM is an employer as defined by the FMLA and at all relevant times to this complaint was a joint employer of Dr. Vashi, controlling the terms and conditions of her employment.

4. The Defendant, the Boston Medical Center Corporation, ("BMC"), is a private, not-for-profit corporation and hospital which operates at One Boston Medical Center Place, Boston, Suffolk County, Massachusetts.  The BMC is the primary teaching affiliate for the BUSM and a safety net hospital.  BMC controls BUD, which is operated for its benefit, and controls where BUD's doctors can practice and the conditions under which they practice.  BMC is an employer as defined by the FMLA.  It gave Dr. Vashi privileges

4

to practice at the BMC to practice at its facilities, thus controlling the terms and conditions of her employment. At all relevant times to this complaint, BMC was a joint employer of Dr. Vashi.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction over the FMLA claims pursuant to 29 U.S.C. §2617 (29 CFR Part 825.400(a) (2)).

4. Personal jurisdiction and venue are appropriate pursuant to 18 U.S.C. §1965 and 28 U.S.C. §1391 since all Defendants are residents of, have an agent or agents, and/or transact their affairs in Boston, Suffolk County, Massachusetts, and the unlawful conduct complained of occurred in this District.

**FACTS**

6. Dr. Vashi is a board-certified dermatologist. Dr. Vashi's clinical and academic work focuses on cosmetic dermatology, ethnic skin care, laser surgery, and the delivery of high-quality, patient-centered care. Dr. Vashi's practice was centered at the BMC, including a busy practice at a low income clinic in East Boston.

7. She is the senior author of over 150 peer-reviewed articles and has contributed to several book chapters. She has edited and written four textbooks.

8. Dr. Vashi is a renowned specialist in her field. She has been quoted, featured, or cited in hundreds of media articles and television programs, including the New York Times, the Boston Globe, Fox News, and WBUR. Her media attention brought increased positive attention to BUD and the BMC.

9. In clinical practice, Dr. Vashi treats a wide range of medical and aesthetic conditions with special focus on cosmetic surgery and skin of people of color. She has served on the

Board of Directors of the Skin of Color Society, the Cosmetics and Laser Writing Committee of the American Board of Dermatology, the Association of Academic Cosmetic Dermatology.

10.    The Association of Academic Cosmetic Dermatology is the lead professional society for dermatologists who direct the education of resident trainees in cosmetic and laser dermatology.  As Cosmetic Director, Dr. Vashi was the lead at BUD for training residents. she served as the Vice-President of the Association of Academic Cosmetic Dermatology.

11.    In 2021, she was named a World Expert in Hyperpigmentation, and in 2024, she received the Norman Orentreich Excellence in Research Award and was a featured guest on Apple's *News in Conversation* podcast. She is also a recipient of the Presidential Citation Award from the American Academy of Dermatology.

12.    BUD hired her in 2012 as an assistant professor at which time she founded the Boston University Center for Ethnic Skin.

13.    During her employment, Dr. Vashi was evaluated positively every year.  She was one of the most productive doctors with a lucrative cosmetics practice, earning one of the highest revenues, publishing among the most papers, and becoming known for her work on ethnic skin.

14.    In 2016, she was named director of the cosmetic and laser center and rated first in patient satisfaction according to a survey.  She was promoted to Associate Professor of Dermatology in 2018.

15.    Dr. Vashi is a philanthropist, starting a charitable organization with her children, "Crafts of Compassion" and donating thousands of dollars since 2020, specifically designed to help the BMC Homeless Funds.

16. Dr. Vashi's work on cosmetic surgery and academic leadership with respect to skin of color brought attention and acclaim to BUD, appearing on several syndicated television platforms continuing through when she was fired in November, 2024.

17. Dr. Rhoda Alani ("Alani"), was the Chair and President, giving her control over the terms, privileges and conditions of Dr. Vashi's employment.

18. Dr. Christina Lam, ("Lam"), was the Vice Chair and medical director, and eventually became the Interim Chair of BUD in February 2024. While she was Interim Chair, she continued to be medical director, consolidating all the power over the department in her. In all her roles, she had control over the terms, privileges and conditions of Dr. Vashi's employment.

19. Dr. Lam was not a productive doctor or researcher, never held an academic position above Assistant Professor through the end of Dr. Vashi's employment, and was given administrative roles by Dr. Alani to justify paying her salary.

20. During her employment at BUD, Dr. Vashi had three children and took FMLA leave each time she gave birth. During each of these FMLA leaves, Dr. Alani and Dr. Lam retaliated against her. The retaliation escalated, coming to a head in 2024.

21. Because of the severity of the previous years' retaliation, Dr. Vashi mental health deteriorated, and took a fourth FMLA leave, intermittently, starting in July 2024 because of it.

**Dr. Vashi's first FMLA Leave and the Defendants' Retaliation**

22. Dr. Vashi had her first child in 2015 and took continuous FMLA leave from August, 2015-October-November 2015. Before she went on leave, she had established a lucrative

cosmetics practice, been doing the most cosmetic procedures, and expressed interest in having the title of Cosmetics Director to Drs. Alani and Lam.

23. While she was on leave, and not seeing patients, the revenue at BUD fell substantially because she was not seeing patients during that time.  Dr. Alani and Dr. Lam resented her FMLA leave because of the decrease in revenue and retaliated against Dr. Vashi for taking it.

24. Despite her clear expression of interest and her lucrative practice, when the position of Cosmetics Director opened, Dr. Alani and Dr. Lam, appointed a woman without children who had not taken FMLA leave and who was not as qualified to hold the position.  There are no formal procedures for naming a director.  Drs. Alani and Lam used their discretion to fill it.  Dr. Alani's and Dr. Lam's decision was retaliation for having taken FMLA leave.

25. When the childless doctor left the position in 2016, Dr. Alani and Dr. Lam appointed another, junior, and less qualified, childless female doctor the Cosmetic Director.

26. Dr. Vashi protested the junior doctor's appointment to the position and was promoted into the position which came with a $50,000 per year stipend.

27. Passing over Dr. Vashi for the director position twice after her continuous FMLA leave was the beginning of a pattern of FMLA retaliation that continued and escalated as Dr. Vashi took more FMLA leaves, culminating in the termination of her employment at the end of 2024.

**Dr. Vashi's FMLA leave in 2017 and Retaliation**

28.    In 2017, Dr. Vashi had her second child and again took full time FMLA leave from December, 2017 through February, 2018.  Again, because of her lucrative practice, her absence decreased the revenue of the practice.

29.    Dr. Vashi feared that Drs. Alani and Lam would retaliate against her by transferring her lucrative cosmetics practice to another doctor.  So, Dr. Vashi arranged with all her cosmetics patients to wait for follow up appointments until after her FMLA leave ended, ensuring that no one else had to see them.

30.    It did not work.  During Dr. Vashi's FMLA leave, Dr. Alani and Dr. Lam moved her cosmetics patients to the junior and unqualified, childless doctor to whom they gave the title in 2016.  They did not re-staff any of Dr. Vashi's other clinics, demonstrating that it was not necessary to restaff Dr. Vashi's cosmetics practice.

31.    Moving her lucrative cosmetics practice to the junior and less qualified, childless doctor who had not taken FMLA leave removed significant revenue from Dr. Vashi.  The revenue removal was retaliation for taking FMLA leave and done to both harm Dr. Vashi and to reward the doctor who had not taken FMLA leave.

32.    After Dr. Vashi's return in February, 2018, Dr. Alani's and Dr. Lam's retaliation continued.  They removed Dr. Vashi 's authority as Cosmetics Director and took her $50,000 director's stipend.  Diminishing Dr. Vashi's authority and taking her stipend was retaliation for having taken FMLA leave.

33.    In contrast, Dr. Alani and Dr. Lam rewarded the childless doctor who had not taken FMLA leave.  They gave her a Professorship with funding, gave her an award and oversight of a fellow.  The fellow was not allowed to work with Dr. Vashi.  The contrast

in the treatment of the two illustrates that the action was taken to retaliate against Dr. Vashi.

34.     Dr. Alani also removed Dr. Vashi's clinic support. Removal of her clinic support meant she could see fewer patients, depriving Dr. Vashi of the ability to earn more income, to conduct research and publish.  Dr. Alani took these actions to retaliate against Dr. Vashi for having taken FMLA leave.

**Dr. Vashi's 2022 and 2023 FMLA leave and Retaliation**

35.     In June, 2022, Dr. Vashi had her third child.  She took FMLA leave and used the BUD paid family leave.  This time, she only took full time leave for a part of her leave and took the rest intermittently because of the retaliation during her first two leaves.  Forcing Dr. Vashi into such a choice interfered with her 2022 FMLA leave.

36.     Her intermittent leave ended in June, 2023.  Again, the revenue of the practice fell because of her taking FMLA leave.

37.     During her full time leave in 2022, Dr. Alani and Dr. Lam hired a woman without children, Dr. Patricia Richey to take over Dr. Vashi's cosmetics practice.

38.     Dr. Alani met with Jamie Levy ("Levy"), the Administrative Director and Dr. Jag Bhawan, the Head of Dermatopathology and proposed to hire Dr. Richey and "get rid of" Dr. Vashi.  Both warned her not to hire Dr. Richey for this purpose.  Dr. Alani hired Dr. Richey anyway for this purpose.

39.     When Dr. Vashi began her intermittent FMLA leave in early 2023, Drs. Lam, and Alani deliberately removed Dr. Vashi's nursing staff, surgical technicians, and medical assistants for her cosmetics practice, leaving Dr. Vashi without adequate clinical support. Withholding support from Dr. Vashi in this way was interference with her ability to take

10

intermittent FMLA leave as well as retaliation for her having taken the full time FMLA leave. The withholding support continued through the end of Dr. Vashi's employment.

40. In contrast, Drs. Lam and Alani provided more than enough support to Dr. Richey for her cosmetics practice. The favoritism was so blatant, the staff began to refer to Dr. Richey as "Queen Richey".

**Retaliation Escalates in 2024**

41. On January 12, 2024, Dr. Lisa Shen, the Residency Program Director, and Dr. Alani met with Dr. Vashi. She was asked to voluntarily reduce her clinical support and to rely on scribes instead.

42. On January 26, 2024, Dr. Alani sent an email that supposedly summarized the meeting. It did not. Instead, the email falsely stated that they had discussed Dr. Vashi's failing to teach residents adequately. They claimed the residents were too fearful of her to ask questions and that she did not treat the residents with respect.

43. They also claimed that the issues about her personally had surfaced repeatedly in the annual surveys of the Accreditation Council for Graduate Medical Education ("ACGME"). None of this was true.

44. Dr. Alani's January 26, 2024) email made several references to Dr. Vashi's balancing her research and other obligations with her family responsibilities. Dr. Alani's references to Dr. Vashi's family responsibilities illustrate that her the false statements in the email were pretexts and that her intent was to retaliate against Dr. Vashi for taking FMLA leave.

45. In fact, Dr. Vashi had been awarded "teacher of the year" twice. There were residents, international students, as well as staff, who came to BUD and BMC specifically to work

with Dr. Vashi. Despite wanting to work with Dr. Vashi, these trainees and staff were assigned to Dr. Lam.

46. Additionally, ACGME put the residency program on probation status, in approximately 2020. The issues underlying the warning were not about Dr. Vashi personally. They were systemic program failures, attributable to Dr. Alani.

47. After Dr. Shen assumed her directorship in 2021, the program problems did not abate. In 2023, the program fired a resident three months before graduation, decreasing morale of the rest of the residents and causing the survey scores to plummet.

48. The ACGME had to send representatives for site visits because of the poor resident survey results and made repeated recommendations to improve the program.

49. The ACGME resident surveys criticized Dr. Shen and ACGME attributed many of the failures to Dr. Shen and at one point recommended that she be removed. BUD opted to keep Dr. Shen in her position.

50. After BUD, BUSM, and BMC terminated Dr. Vashi's employment, in 2025, the ACGME cited the residency program both for the previous issues incorrectly blamed on Dr. Vashi and for new reasons. The continuation of the problems with the residency program illustrates that blaming them on Dr. Vashi was a pretext for FMLA retaliation and interference.

51. It was not true that multiple residents had complained about Dr. Vashi repeatedly. Dr. Alani had spoken **once** with Dr. Vashi, four years previously, in 2020, about teaching and treatment of residents, and these complaints were never formally recorded in a performance review or in a performance improvement plan. Although Dr. Vashi did not find the complaints meritorious, she took special efforts to address the concerns.

12

52. No one brought anything to her about residents in the years after 2020 until Dr. Lam retaliated against her in 2024.

53. The alleged multiple complaints brought up in 2024 were pretexts to retaliate against Dr. Vashi for having taken FMLA leave.

54. Dr. Shen and Dr. Alani were, in fact, referring to only one resident: Dr. Frederick Gibson, the chief resident. Dr. Vashi had rarely worked with him.

55. Dr. Gibson had a close relationship with Dr. Alani who officiated at his wedding. Dr. Alani used her close relationship with Dr. Gibson to get him to complain about Dr. Vashi to retaliate against her for having taken FMLA leave.

56. Dr. Vashi had good relationships with the residents, and taught and mentored many, particularly doctors of color. She had never seen any negative resident reviews from the ACGME surveys that were attributable directly to her.

57. Dr. Shen had been disparaging of Dr. Vashi's family responsibilities, incredulously stating to the staff, multiple times, that she did not know how Dr. Vashi could juggle that much responsibility. She had been communicating falsely disparaging information about Dr. Vashi's conduct with residents to human resources deliberately to disparage Dr. Vashi and provide a false basis to fire her. Dr. Shen's actions were in retaliation for Dr. Vashi's having taken FMLA leave.

58. After her return from FMLA leave in 2023, Dr. Alani and Dr. Lam began to pile over 50 patients per day into Dr. Vashi's schedule, while not providing her with adequate support. Dr. Vashi could not teach residents with such a large load of patients and without the required support.

59. BUD capped the number of patients that could be seen by any physician after firing Dr. Vashi, illustrating that it knew that patient volume was an issue with the residency program, not Dr. Vashi personally.  The alleged complaints from residents were therefore used by Drs. Shen and Lam as a pretext for retaliation.

60. Dr. Richey was expected to see far fewer patients and received much more support, including residents, illustrating that the complaints of the residents were being used as a pretext with Dr. Vashi.

61. Being forced to see 50 or more patients daily without adequate support also created unsafe conditions for the patients by reducing the time available for proper patient evaluation, informed consent, procedure performance, and post-procedure care.

62. Dr. Vashi repeatedly reported these unsafe practices to the clinic manager, Luchie Abdal-Khallaq and to Dr. Lam, both the medical director and vice-chair, who handled all issues with the clinical practice.

63. Dr. Alani and Dr. Shen's blaming Dr. Vashi for the systemic problems with the residency program were pretexts for FMLA retaliation and interference.

64. Drs. Lam and Alani used the false claims about Dr. Vashi's teaching to remove her trainee support and to remove cosmetic patients from her Tuesday schedule.

65. They also decided to remove her oversight of the cosmetic laser surgery program.  They gave the oversight and Dr. Vashi's Cosmetics Director title to Dr. Richey.  Dr. Richey, however, got the authority to go with the title.

66. In January and February 2024, Dr. Lam began approaching Dr. Richey to take over Dr. Vashi's position.

67. Dr. Alani's and Dr. Lam's removal of Dr. Vashi's title, giving it to Dr. Richey with the authority, approaching Dr. Richey to take over Dr. Vashi's position, reducing Dr. Vashi's trainee support, and reducing her cosmetics patient time was retaliation for Dr. Vashi having taken FMLA leave.

**Dr. Alani Attempts to Fire Dr. Vashi**

68. When Dr. Vashi received Dr. Alani's follow up email on January 26, 2024, she told Dr. Alani that she was going to human resources and would leave if the resources issue was not resolved. Dr. Alani responded that Dr. Vashi had resigned. Dr. Vashi had obviously not resigned and Dr. Alani deliberately misinterpreted Dr. Vashi to retaliate against her for having taken FMLA leave.

69. Dr. Vashi reported Dr. Alani's and Dr. Shen's false reports about residents to human resources and to Levy. She told Dr. Alani that she did not resign and continued to see her patients.

70. Levy informed Dr. Vashi that he would take care of Dr. Alani, that he was meeting with human resources to address her situation and that Dr. Lam and Dr. Shen were doing Dr. Alani's bidding. Levy's statement illustrates that Dr. Shen and Dr. Lam were assisting Dr. Alani in retaliating against Dr. Vashi for having taken FMLA leave. It also illustrates that BUD, BUMS, and BMC were aware of the retaliation or should have been aware of it.

71. On February 15, 2024, Dr. Alani fired Dr. Vashi, stating that the leadership team, which included both her and Dr. Lam, agreed to fire her.

**Dr. Alani's Mentee, Dr. Gibson, Disseminates False Accusations About Dr. Vashi, Asking Other Residents to Sign A Petition**

15

72.    The day after Dr. Alani fired Dr. Vashi, on February 16, 2024, Dr. Gibson, Dr. Alani's mentee, sent a petition falsely accusing Dr. Vashi of intimidation, favoritism, and unprofessionalism to all fifteen residents in the program. The petition, based on the false accusations, sought Dr. Vashi's termination of employment. He asked the other residents to sign it. Dr. Gibson wrote these false claims at the behest of Dr. Alani to help her make a case to fire Dr. Vashi.

73.    After Dr. Gibson sent his petition, Dr. Shen began to call residents urging them to sign Dr. Gibson's false statements and to write their own letters. Dr. Shen took her actions to retaliate against Dr. Vashi for taking FMLA leave.

**Dr. McAneny's Investigation into Dr. Vashi's Relationships with Residents and Others Shows that the Problem was Not Dr. Vashi**

74.    On February 17, 2024, Chief Medical Officer, David McAneny, informed Dr. Vashi that she was not fired.

75.    Dr. McAneny conducted a weeks long investigation into the accusations made about Dr. Vashi. He investigated both the residents and other staff and clinicians who worked with Dr. Vashi. At the end of it, he told her that that the claims made by Dr. Gibson were false. Rather, his investigation illustrated that all those who worked with Dr. Vashi had positive experiences with her.

76.    Dr. Alani was removed as Chair in the dermatology department in February 2024, but the Defendants had no intention of remedying the FMLA retaliation Dr. Vashi experienced.

77.    Dr. Alani kept her appointment with the dermatology department, retained an office in the department, and received a generous $30,000 stipend. Her office continued to be right

down the hall from Dr. Vashi's. Dr. Vashi was forced to avoid using her office to avoid Dr. Alani.

78. BUD and BUSM took no action towards Dr. Lam for her role with Dr. Alani to retaliate against Dr. Vashi by replacing her and firing her. Instead, Dr. Lam was rewarded by being named Interim Chair. Dr. Shen and Dr. Gibson also had no repercussions for their role in the attempt to fire Dr. Vashi

79. Dr. Vashi expressed concerns to Dr. McAnemy about Dr. Lam replacing Dr. Alani since Dr. Lam had also been retaliating against her. She also expressed concerns about Dr. Gibson and Dr. Shen having no repercussions since they also were active participants with Dr. Alani.

80. Dr. McAneny said he would investigate the issue, but he did not. BUD and BUSM took no remedial action towards Dr. Lam, Dr. Gibson, or Dr. Shen, allowing the retaliation to continue.

81. In March, 2024, Dr. Vashi sought assistance from the Senior Vice President and Chief Human Resources Officer of BMC, Lisa-Kelly Croswell because she was concerned that the retaliation would continue. She met with Croswell and told her how Drs. Lam and Alani would retaliate against her when she took FMLA leave by stealing her patients, removing her titles and compensation, and take other actions that would disadvantage her. Croswell ultimately did nothing to respond to the FMLA retaliation.

82. Dr. Vashi also sought assistance from the Omnibuds, Francine Montemurro in March, 2024 because she was concerned that Dr. Gibson, Dr. Shen, and Dr. Lam would continue to retaliate against her. She had continued communications with Montemurro through 2024 about the ongoing retaliation, but the retaliation did not stop.

83.    In April 2024, Dr. Vashi became aware of a complaint made to the Board of Registration in Medicine. The complaint was filed and sent to Dr. Vashi at BUD on February 16, 2024, but no one provided it to Dr. Vashi, despite it having been opened. By the time Dr. Vashi received it, it was past the deadline for a response. The complaint was baseless and the Board dismissed it.

84.    In April, 2024, Dr. Vashi and Dr. Lam had a facilitated conversation with Dr. McAneny. Despite Dr. Lam's role in Dr. Alani's plan to get Dr. Vashi fired for having taken FMLA leave, Dr. McAneny instructed Dr. Vashi to "obey" Dr. Lam and not to be insubordinate to her. There was no action taken to address Dr. Lam's FMLA retaliation or the complicity of Drs. Shen and Gibson.

85.    In May, 2024, Dr. Lam removed Dr. Vashi's patients and transferred them to Dr. Richey, continuing with the retaliation that Dr. Alani had started. Dr. Lam took these actions to retaliate against Dr. Vashi for having taken FMLA leave.

86.    In July, 2024, Dr. Vashi began interim FMLA leave because of the stress of retaliation and the BORIM complaint. She was diagnosed with Post Traumatic Stress Disorder and prescribed medication and therapy. She initially resisted taking FMLA leave because of the retaliation she had previously experienced.

87.    A human resources representative, Robin Lucier, pushed her to take it, promising that she would be supported when she took it this time. She told Lucier that she did not take full FMLA leave because each time she had taken FMLA leave in the past, her responsibilities were removed or people were hired to replace her. Lucier's promises of support were false.

88.    Dr. Vashi also told the Montemurro that she was concerned about taking FMLA leave because of Dr. Lam.

89.    Dr. Vashi took intermittent FMLA leave even though she truly needed full time FMLA leave.

90.    Throughout the summer of 2024, Dr. Lam had numerous meetings with Dr. Vashi, which included Dr. Shen and Levy, during which they pressured Dr. Vashi to bring Dr. Gibson back to her clinics, despite his role in attempting to get her fired and his, public and proven false, accusations about her.  Dr. Vashi repeatedly refused and explained it was because of his role in the attempt to get her fired.

91.    Dr. Vashi complained to Dr. McAneny and Human Resources the pressure to work with Dr. Gibson when the investigation found his public accusations to be false.  Dr. Lam pressured Dr. Vashi to work with Dr. Gibson to retaliate against Dr. Vashi for having taken FMLA leave and to interfere with her ability to take the intermittent leave to treat for her mental health.

92.    Dr. Lam also repeatedly refused to reimburse Dr. Vashi for expenses which were normally approved without incident.  Dr. Lam refused to approve them to interfere with Dr. Vashi's intermittent FMLA leave and to retaliate against her for having taken FMLA leave.

93.    Dr. Lam refused to approve Dr. Vashi's research proposals.  Without Dr. Lam's approval, Dr. Vashi could not take advantage of research grants that she had received, stunting her research.

94. Dr. Lam's refusal to reimburse Dr. Vashi's expenses and to approve her research proposals was retaliation for having taken FMLA leave for her births and interreference and retaliation for taking intermittent FMLA leave to care for her mental health.

95. In August and September, 2024, a resident, Dr. Allison Perz falsely accused Dr. Vashi of signing out controlled substances reserved for the residents under a resident's name, rather than her own, allegedly in violation of policy.  There was no policy at the time about doctors signing out products reserved for residents, making these accusations false. She made her false accusation to Dr. Lam and Dr. Shen.

96. In fact, Dr. Vashi and Dr. Lam jointly collaborated to treat Dr. Lam's autoimmune patients.  During this collaboration, Dr. Lam asked Dr. Vashi to use substances from the resident's designated product regularly.  Dr. Perz' accusation was an instance of Dr. Lam asking Dr. Vashi to use the residents' controlled substances for their collaboration.

97. Dr. Perz made her false accusation to assist Dr. Lam in building a false case to fire Dr. Vashi.  Dr. Lam encouraged Dr. Perz' behavior to continue retaliating against Dr. Vashi. Dr. Lam rewarded Dr. Perz by hiring her on to the faculty right after she fired Dr. Vashi.

98. In an attempt to substantiate her false accusations, Dr. Perz gained unauthorized access to the medical records of Dr. Vashi's patients to search for evidence that Dr. Vashi had taken product and used a resident's name to sign it out.

99. When Dr. Vashi found out about Dr. Perz' unauthorized access to her patients' medical records, she reported Dr. Perz to both Lucier of Human Resources and Dr. Shen.

100. Dr. Shen excused Dr. Perz' behavior and took no action to address the unauthorized access to Dr. Vashi's patients' private medical records.

101. In the fall of 2024, because of her intermittent FMLA leave, Dr. Vashi was not seeing her quota of patients. BUD, BUSM, and BMC penalized her for her protected leave by denying her a bonus and requiring that she "buy" the lost visits back. This action was interference with her taking intermittent FMLA leave.

102. In early October, 2024, Dr. Lam reviewed Dr. Vashi's performance. Dr. Lam complained that Dr. Vashi failed to respond to emails in a timely manner, turned the clinic into chaos, and added patients to the schedule outside normal processes. Dr. Vashi responded to all Dr. Lam's emails in a timely manner. The issue with adding patients was because of management decisions Dr. Lam had made, not because Dr. Vashi had deliberately circumvented the scheduling process.

103. Dr. Lam used these complaints as pretexts to interfere with Dr. Vashi's intermittent FMLA leave and to retaliate against Dr. Vashi for having taken FMLA leave for the birth of her child.

104. Dr. Lam used the filming of a documentary which highlighted Dr. Vashi's work, which would bring positive attention to the clinic and highlighted Dr. Vashi's work, as an example of how Dr. Vashi turned the clinic into chaos. Characterizing an event that brought the clinic acclaim and attention and which would bring more patients as a problem illustrates that Dr. Lam's criticisms was an obvious pretext.

105. The chaos Dr. Lam described was not true. Dr. Vashi had coordinated the entire interview with BMC's Media department and with clinic management. BMC media representatives were at the entirety of the interview.

106.    The only chaos in the clinic was because BU and BUSM did not have enough staff. Managers and staff were out for long periods of time and staff was allocated unevenly, making management of the office a challenge.

107.    Dr. Vashi had added her own patients to the schedule because staff had been unable to schedule them for her.

108.    Dr. Lam was aware of the true problems, but she blamed Dr. Vashi to retaliate against her for taking FMLA leave and to interfere with her taking the intermittent FMLA leave.

109.    In late October, 2024, Dr. Vashi was called to a meeting with Human Resources. During the meeting, she was confronted with Dr. Perz' accusation about taking product under the name of a resident. The Human Resources representative asked her a series of questions about the missing product, implying she had stolen it. Dr. Vashi explained that Dr. Lam had given her permission and encouraged her to use the product.

110.    During the October, 2024 meeting, Human Resources again falsely accused Dr. Vashi of causing chaos in the clinic because of the television interview.

111.    Dr. Richey signed out resident product for her patients, storing the open product in the refrigerator for months. Dr. Richey's actions were a violation of the requirements of Joint Commission on Accreditation of Healthcare Organizations ("JACHO"). Dr. Richey was not penalized for her violations nor accused by Human Resources of stealing from the residents.

112.    In addition, doctors and staff at BUD regularly left expired filler in the refrigerator. BUD's policy requires that expired filler cannot sit for more than twenty-four hours. These regular violations of policy went unaddressed.

113. One doctor left uncapped needles attached to syringes with unknown product in the refrigerator for many months before finally disposing of it. That doctor was not penalized or accused by Human Resources.

114. The favorable treatment of Dr. Richey and the other BUD doctors illustrates that the accusations to Dr. Vashi were pretexts. The real reason for the accusations was because she was taking intermittent FMLA leave for her mental health and had taken FMLA leave for her child.

115. After their meeting in late October, 2024, Dr. Vashi took a picture of the open syringes to show Human Resources. She emailed Human Resources asking for a meeting to explain that she was being targeted. Human Resources never responded to her.

116. After her meeting with Human Resources in late October, 2024, Dr. Vashi notified the Omnibuds that she was being targeted by Dr. Lam. No action was taken to stop Dr. Lam.

117. Dr. Vashi continued not to have sufficient staff support for her practice during the fall of 2024 because Dr. Lam kept her from having it. Dr. Lam kept the resources from her to retaliate against her for her previous leaves and to interfere with her intermittent FMLA leave.

118. On November 18, 2024, the Defendants through Dr. Lam, terminated Dr. Vashi's employment. Dr. Lam told Dr. Vashi that she was fired for causing too much chaos in the clinic and for being disrespectful and insubordinate to Dr. Lam. The chaos referred to Dr. Vashi's television interview which had brought positive attention to the clinic.

119. The accusations of insubordination and disrespect were untrue. Dr. Lam did not explain what she meant by either.

120. Dr. Vashi protested being fired while on intermittent FMLA leave. The Human Resources representative, Robin Lucier, who had encouraged Dr. Vashi to take FMLA leave because this time she would be supported, responded that being on leave did not matter.

121. As a result of the interference and retaliation, Dr. Vashi has incurred emotional distress, lost business opportunities, lost income and financial benefits, liquidated damages, and attorneys' fees and costs.

122. Dr. Vashi was not allowed to work at the BMC clinic for low income patients in East Boston where she had developed a regular practice. Other doctors who left BUD and BUSM were allowed to continue to practice at other similar type of community clinic locations. Barring her from seeing patients at the low income clinic was retaliation for her having taken intermittent FMLA leave.

123. BU deliberately structured the end of her employment as a termination which required Dr. Vashi to report that she had been "terminated" to new employers. The fact that she had been terminated held up her credentialing at her new employer for approximately eight months, causing her both emotional distress and loss of income.

124. With the termination of her employment from BUD, her relationship with BUSM ended, and Dr. Vashi lost research grants which damaged her academic career to the point that it is unlikely to recover. In particular, she lost the ability to participate with the Dermatology Basic Science Researchers, a significant benefit to her career because it was a new area of research which would have opened new collaborations and research networks for her.

125.    In addition to the research opportunity, Dr. Vashi had been in talks with the Vascular Department to start a Vascular Clinic.  With the termination of her employment, she was not longer able to pursue this opportunity.

## COUNT I
## RETALIATION FOR EXERCISING RIGHTS AFFORDED UNDER THE FMLA
### 29 U.S.C. § 2615(a) (2)

The Defendants' conduct, as set forth above, constitutes violations of the FMLA, 29 U.S.C. § 2615(a) (2), and its attendant regulations.

## COUNT II
### INTERFERENCE
### 29 U.S.C. § 2615(a) (1)

The Defendants' conduct, as set forth above, constitutes violations of the FMLA, 29 U.S.C. § 2615(a) (1), and its attendant regulations.

WHEREFORE, Dr. Vashi requests that this Court award the following relief:

Order the Defendants to pay Dr. Vashi:

a) Back pay;

b) Front pay;

c) Lost benefits;

d) Emotional distress damages;

e) Punitive damages;

f) Attorneys' fees and costs as provided for by statute; and

g) Any other relief to which Dr. Vashi may be entitled.

### JURY DEMAND

Dr. Vashi demands a trial by jury on all of her claims.

Respectfully submitted,
DR. NEELAM VASHI,
By her attorney,

Dated: May 31, 2026

Rebecca G. Pontikes, BBO # 637157
Bryn A. Sfetsios, BBO # 688368
Joseph Verran, BBO # 713751
10 Tremont Street, 2nd Floor, Suite 207
Boston, MA 02108
(617) 357-1888
Jverran@pontikeslawllc.com
rpontikes@pontikeslawllc.com
bsfetsios@pontikeslawllc.com